## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**EZEKIEL LEE MIDKIFF,**

      **Plaintiff,**

v.                             **Case No.: 2:18-cv-00338**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 8, 9). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the

1

Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On January 29, 2015, Plaintiff, Ezekiel Lee Midkiff ("Claimant"), completed an application for DIB, alleging a disability onset date of September 1, 2010 due to severe anxiety. (Tr. at 174-75, 205). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 108-12, 114-16). Claimant filed a request for an administrative hearing and amended his alleged onset date to December 30, 2014. (Tr. at 60, 119-20). Claimant's administrative hearing was held on July 26, 2017 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 33-59). By written decision dated September 11, 2017, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 17-27). The ALJ's decision became the final decision of the Commissioner on January 18, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 9). Consequently, the issues are fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 53 years old on his amended alleged onset date and 56 years old on the date of the ALJ's decision. He completed high school and communicates in English. (Tr. at 204, 206). Claimant previously worked as a heavy equipment operator in the coal mining industry for over thirty years. (Tr. at 206).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed

mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2020. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 10, 2014, his amended alleged onset date. (Tr. at 20, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "carpal tunnel syndrome, major depressive disorder, generalized anxiety disorder, schizophrenia, and borderline intellectual functioning." (*Id.,* Finding No. 3). The ALJ also considered Claimant's type II diabetes mellitus but determined that the impairment was non-severe. (Tr. at 20). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels. He can frequently, but not continuously, handle, finger, and feel with both upper extremities. The claimant retains the capacity to understand, remember, and carry out simple, routine, repetitive tasks of one to two steps. He can respond appropriately to occasional interaction with coworkers and supervisors, but should have no interaction with the public. Social interaction should not involve team work or over-the-shoulder supervision. The claimant can make simple work-related decisions, but work activity should not involve fast-paced production requirements.

(Tr. at 22-25, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any of his past relevant work. (Tr. at 25, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 25-27, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1961 and was defined as an individual closely approaching advanced age on the alleged disability onset date, but that Claimant then attained the age of 55 and became an individual of advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 25, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including unskilled work as a dining room attendant, janitor or cleaner, and vehicle and equipment cleaner at the medium exertional level; or a cleaner, stock clerk, and scale operator at the light exertional level. (Tr. at 26-27, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant states that his challenges to the Commissioner's decision are "primarily procedural," focusing on a July 24, 2017 opinion rendered by his treating psychiatrist, Mark Casdorph, D.O. (ECF No. 7 at 3). Claimant argues that the ALJ erroneously rejected Dr. Casdorph's July 24, 2017 Mental Status Statement of Ability to do Work-Related Activities (Mental) form under 20 CFR 404.935(b) on the ground that Claimant did not

establish good cause for not submitting the form more than five days prior to Claimant's administrative hearing, as required. Claimant contends that the ALJ should have accepted Dr. Casdorph's July 2017 form, because it did not exist until two days prior to the hearing, which clearly constituted an "unusual, unexpected, or unavoidable circumstance" beyond Claimant's control that prevented him from submitting the form earlier, thus establishing good cause under 20 CFR 404.935(b)(3). (*Id.* at 7). Furthermore, Claimant asserts that Dr. Casdorph's July 2017 opinion was critical to the disability determination because it both supported and explained an earlier June 6, 2015 opinion by Dr. Casdorph to which the ALJ had ascribed little weight on the basis that the opinion lacked sufficient support and explanation. (*Id.* at 8). Finally, Claimant argues that the ALJ's error was compounded by the Appeals Council's subsequent refusal to incorporate Dr. Casdorph's July 2017 opinion into the record and consider it with the rest of the evidence when deciding whether there was a basis for review of the ALJ's decision. (*Id.*).

      In response to Claimant's arguments, the Commissioner disputes that Claimant's delay in submitting Dr. Casdorph's July 2017 opinion was the result of an unusual, unexpected, or unavoidable circumstance beyond Claimant's control. (ECF No. 8 at 6). The Commissioner points out that Claimant has provided no proof that he tried, but was unable, to obtain an updated medical opinion from Dr. Casdorph at least five days before the July 26, 2017 administrative hearing. The Commissioner notes that given Claimant's seven-year treatment relationship with Dr. Casdorph, and Dr. Casdorph's prior willingness to provide an opinion in June 2015, he likely would have accommodated Claimant's request for an update sufficiently in advance of the hearing had the request been made in a timely manner. (*Id.* at 7). The Commissioner further argues that Dr.

Casdorph's opinion did not fill any evidentiary gap in the record because the ALJ did not discount Dr. Casdorph's June 2015 opinion simply because it lacked an explanation, which Claimant argues was supplied by the July 2017 opinion. Instead, the ALJ also discounted the June 2015 opinion because it was inconsistent with the medical evidence of record. Dr. Casdorph's July 2017 opinion did not change the medical evidence, which in the Commissioner's view, continued to conflict with the 2015 opinion. (*Id.* at 7-8 n.3). The Commissioner also maintains that the Appeals Council properly concluded that Claimant did not demonstrate good cause for failing to timely submit Dr. Casdorph's 2017 opinion. (*Id.*).

Claimant's reply to the Commissioner's response asserts that the Commissioner adduces a "rigorous standard" that is not imposed by the regulations regarding the criteria that must be met in order for a claimant to establish good cause for not submitting evidence at least five days prior to the administrative hearing. (ECF No. 9 at 1). Claimant reminds the Court that the Social Security disability determination process is not intended to be an adversarial proceeding and argues that to allow the SSA to reject probative evidence based upon strict adherence to a procedural technicality runs afoul of the purpose of the Social Security regulations.

## V.    **Relevant Evidence**

In this matter, as previously indicated, the record includes evidence which the ALJ considered in rendering her decision, as well as evidence that the ALJ declined to accept. The evidence which the ALJ rejected was the July 24, 2017 opinion of Dr. Casdorph, as well as additional psychiatric treatment records. The undersigned has reviewed all evidence of record and summarizes the evidence that is most relevant to the issues in dispute below:

### A. Treatment Records

#### 1. Treatment records considered by the ALJ

Dr. Casdorph began treating Claimant on September 1, 2010 for a delusional disorder and major depressive disorder. (Tr. at 280). Within a week of beginning treatment with Dr. Casdorph, Claimant voluntarily presented to Highland Hospital for in-patient psychiatric treatment for a period of three days from September 7 to September 9, 2010. (Tr. at 275). Claimant stated that he came to the hospital to "get his nerves settled." (Tr. at 276). He expressed beliefs that his work supervisor turned his coworkers against him and that his neighbors took notes about him. (*Id.*). Claimant's family stated that Claimant had been paranoid for three years, but that it had worsened in the prior three months. (*Id.*). Claimant was diagnosed with a delusional disorder and prescribed the medications Invega and Abilify at the hospital. (*Id.*). His family stated that he showed much improvement at the hospital and expressed interest in bringing him home. (*Id.*). Claimant was prescribed Invega at discharge and scheduled to follow up with Dr. Casdorph. (*Id.*).

Claimant's next several years of treatment with Dr. Casdorph are not documented in the present record. However, Claimant saw Dr. Casdorph on February 3, 2015, following his alleged onset of disability in late December 2014. (Tr. at 287). Dr. Casdorph noted that Claimant's diagnoses included major depressive disorder and a psychosis disorder, not otherwise specified. (*Id.*). Claimant was currently prescribed Invega and Pristiq. (*Id.*). On April 14, 2015, Dr. Casdorph discussed that Claimant remained relatively symptom-free and stable since beginning psychiatric medications and that he required only minor adjustments to his medications. (Tr. at 288). On examination, Claimant was cooperative and pleasant with normal eye contact and motor activity. (Tr. at 288-89). He

9

had a poverty of speech and a constricted affect, but he did not have any hallucinations; his thought processes were goal directed, logical, and relevant; his thought content was appropriate; his immediate, recent, and remote memory and judgment were intact; his insight was fair; and he was oriented in all spheres. (Tr. at 289). Dr. Casdorph noted that Claimant had only mild problems related to his social environment. (Tr. at 290). Dr. Casdorph diagnosed Claimant with a psychotic disorder and mild intellectual disability. (*Id.*). Dr. Casdorph renewed Claimant's prescription for Risperdal and changed Claimant's anti-depressant medication from Pristiq to Effexor due to cost. (Tr. at 291).

On July 7, 2015, Claimant again followed up with Dr. Casdorph. Dr. Casdorph noted that Claimant was responding to his medications and that he did not have symptoms of psychosis or depression while living in the "sheltered" living arrangement with his mother. (Tr. at 309). On examination, Claimant's affect was constricted, but appropriate; his motor activity was calm; his attention/concentration was good; his memory, thought processes, and judgment were intact; he was oriented within normal limits; and his speech was slow. (Tr. at 310). His diagnoses included a psychotic disorder, not otherwise specified; major depressive disorder; and a mild intellectual disability. (Tr. at 311). Claimant was again noted to have only mild psychosocial and environmental problems. (*Id.*). Dr. Casdorph decreased Claimant's dosage of Risperdal due to possible tardive dyskinesia, which is a side effect of antipsychotic medications that causes involuntary body movements, and he renewed Claimant's prescription for Effexor. (Tr. at 312).

The following month, on August 13, 2015, Claimant presented to Dr. Casdorph and was accompanied by his mother. Claimant's mother stated that Claimant was "zoned out" when she talked to him, and Claimant admitted to being easily distracted. (Tr. at 314). On

examination, Claimant's affect was constricted, but appropriate; his attention/concentration was fair; his speech and orientation were normal; his memory and thought processes were intact; his judgment was mildly impaired; and he had partial insight. (Tr. at 315). His diagnoses included a psychotic disorder, not otherwise specified; avoidant personality disorder; and mild intellectual disability. (Tr. at 316). Dr. Casdorph again reduced Claimant's dosage of Risperdal due to likely side effects and continued Claimant on Effexor. (Tr. at 317).

On September 10, 2015, Claimant and his mother reported to Dr. Casdorph that Claimant was "doing okay." (Tr. at 319). His mood remained fairly stable. (*Id.*). Claimant reported that he pursued activities that interested him at home, such as "tinker[ing] with equipment in his garage," and he really enjoyed mowing the lawn. (*Id.*). His mental status examination was generally the same as the prior month. (Tr. at 320). His diagnoses and treatment plan were also unchanged. (Tr. at 321-22).

On February 25, 2016, Claimant told Dr. Casdorph that his medications were working fine and he wanted to continue on the same treatment plan. (Tr. at 324). Claimant continued to engage in activities of interest at home, but he rarely left home without his mother. (*Id.*). Claimant reported that he felt anxious, but stated that he drank multiple pots of coffee per day. (*Id.*). He related that he was doing well and liked "to work on old tractors." (*Id.*). On examination, Claimant described his mood as "feeling good" and his affect was appropriate; his motor activity was calm; his attention/concentration was good; his speech and orientation were normal; and his memory, thought processes, and judgment were all intact. (Tr. at 325). His diagnoses were noted to be a brief psychotic disorder and persistent depressive disorder. (Tr. at 326). Dr. Casdorph renewed Claimant's prescriptions for Risperdal and Effexor. (Tr. at 327).

Claimant followed up with Dr. Casdorph on June 15, 2016 for another regularly-scheduled appointment. Claimant did not have any depression or apparent disturbance of thought content, he was feeling "pretty good," and his mental status examination was normal other than a constricted, but appropriate affect. (Tr. at 355-56). Claimant's diagnoses remained the same and he was noted to be improving. (Tr. at 357). Dr. Casdorph documented that Claimant had been stable for over two years and that his depression and delusions resolved with treatment. (Tr. at 358). Dr. Casdorph further reduced Claimant's dosage of Risperdal due to metabolic side effects and continued Claimant on the anti-depressant Effexor. (*Id.*).

The following month, on July 20, 2016, Claimant reported to Dr. Casdorph that he was doing well on the lowered dose of Risperdal with no depression or emergence of disturbance of thought content. (Tr. at 360). On his mental status examination, Claimant's affect was appropriate; his motor activity was calm; his attention/concentration was good; his speech was normal; and his memory, thought processes, and judgment were intact, although he had partial insight. (Tr. at 361). Due to Claimant's metabolic changes, the fact that Claimant tolerated the lowered dose of Risperdal, and the fact that Claimant did not have any psychosis for an extended period of time, Dr. Casdorph reduced Claimant's dosage of Risperdal even further and again prescribed Claimant Effexor. (Tr. at 363).

On September 21, 2016, Claimant told Dr. Casdorph that he was "doing well." (Tr. at 365). His mood was stable; he had no disturbances in his thought content; and he continued to engage in activities of interest. (*Id.*). Claimant's mental status examination was normal other than a constricted, but appropriate affect. (Tr. at 366). His diagnoses and medications remained the same. (Tr. at 367-68).

**2. Treatment records that were not considered by the ALJ**

On December 21, 2016, Claimant presented to Dr. Casdorph complaining of increased forgetfulness. (Tr. at 67). Dr. Casdorph noted that Claimant continued to be anxious around others and was unable to go places, such as the store, without his mother. (*Id.*). Dr. Casdorph recorded that Claimant's mother fixed all meals and paid all of the bills. (*Id.*). However, Claimant worked on small projects around the house and maintained an active, physically-demanding lifestyle. (*Id.*). Dr. Casdorph stated that Claimant seemed more restless since his prior medication change to metformin. (*Id.*). On examination, Claimant's affect was constricted and his immediate memory was impaired, but his motor activity was calm; his attention/concentration was fair; his speech was normal with a paucity of language; his orientation was within normal limits; and his thought processes and judgment were intact. (Tr. at 68). Dr. Casdorph concluded that Claimant remained responsive to Effexor and Risperdal and thus continued Claimant's treatment plan. (Tr. at 70).

On March 22, 2017, Claimant saw registered nurse, Jordan Adkins, for medication management because Dr. Casdorph was unavailable. (Tr. at 82). Claimant stated that his anxiety and memory were "alright." (Tr. at 72). He denied experiencing panic attacks, depression, hallucinations, or paranoia. (*Id.*). Claimant related that he did have some degree of anxiety every day, which was worse around "people/crowds." (*Id.*). However, he did not isolate himself and stayed busy. (*Id.*). Claimant related that he "had fun working outside a lot on tractors [and] mowing grass." (*Id.*). His affect was constricted, but his mood and attention/concentration were good; his motor activity was calm; his speech and orientation were normal; his memory, thought processes, and judgment were intact; and his insight was present. (Tr. at 73-74). His diagnoses included a brief psychotic disorder

and persistent depressive disorder. (Tr. at 74). Claimant was noted to be "improving" and Claimant's prescriptions for Effexor and Risperdal were renewed. (Tr. at 75).

On July 12, 2017, Claimant presented for another follow-up appointment with Dr. Casdorph. Claimant reported that he continued to stay busy in his garage but did not go anywhere "of note" without his mother. (Tr. at 77). Claimant's affect was blunted and his immediate memory was impaired, but he was calm; his attention/concentration was good; his speech and orientation were normal; and his thought processes and judgment were intact. (Tr. at 78). Claimant's diagnoses and treatment plan remained the same. (Tr. at 79-80). Dr. Casdorph stated that Claimant remained stable on his medications while living in a semi-protected environment. (Tr. at 80).

### B. Evaluations and Opinions

#### 1. Evaluations and opinions considered by the ALJ

On April 6, 2015, agency psychologist, Nicole M. Smith, M.A., performed a consultative mental examination of Claimant. Ms. Smith took note of Claimant's psychiatric treatment history, including his voluntary admission at Highland Hospital in 2010 after which Claimant received outpatient psychotropic medication management three to four times per year by Dr. Casdorph. (Tr. at 294-95). On examination, Claimant was cooperative; his speech was clear and coherent; he maintained good eye contact; he was oriented in all spheres; his thought processes were clear and connected; his judgment was good; his insight was fair; and his immediate and remote memory were normal. (Tr. at 296). However, Claimant's affect was somewhat restricted, and his recent memory was moderately impaired. (*Id.*). Claimant's concentration, persistence, and pace was noted to be only mildly deficient. (*Id.*). His social functioning was moderately-to-severely impaired during the evaluation. (*Id.*). Ms. Smith concluded that Claimant's diagnoses included

14

major depressive disorder, generalized anxiety disorder, unspecified schizophrenia spectrum and other psychotic disorder, and provisional borderline intellectual functioning. (*Id.*). Claimant's social functioning included going to the store, eating out at restaurants, and attending church services weekly; running errands and visiting with family and friends daily; and speaking with his niece on the telephone every other day. (Tr. at 297). Claimant maintained hobbies such as mowing the grass, performing yard work, and working on tractors. (*Id.*). Claimant managed his medical appointments and paid bills, but his mother helped him manage his finances. (*Id.*). His prognosis was listed as poor. (Tr. at 298).

On May 9, 2015, agency psychologist, Jeff Harlow, Ph.D., evaluated Claimant's mental impairments based upon a review of his records, including Claimant's consultative examination. Dr. Harlow concluded that Claimant had severe schizophrenic, paranoid, and other functional disorders, as well as affective disorders, that moderately restricted his activities of daily living and social functioning, but only mildly limited Claimant's ability to maintain concentration, persistence, or pace. (Tr. at 91). Dr. Harlow found that Claimant did not have any limitations in remembering or understanding and that, notwithstanding his mental impairments, Claimant could perform repetitive one and two-step work like activities. (Tr. at 93-94). Amy Logan, Ph.D., affirmed Dr. Harlow's mental RFC assessment on August 5, 2015. (Tr. at 101-04).

On June 6, 2015, Dr. Casdorph completed a medical source opinion form regarding Claimant. Dr. Casdorph stated that Claimant suffered from bipolar disorder with mood congruent psychotic features. (Tr. at 277). When asked to describe Claimant's work-related functional limitations, Dr. Casdorph responded that Claimant remained paranoid and guarded around others, although he was no longer acting on his psychosis due to

medication. (Tr. at 277). Dr. Casdorph stated that it would place Claimant at a high risk for violent deterioration if he returned to the workplace. (*Id.*). According to Dr. Casdorph, Claimant's mother managed/provided Claimant's food, shopped, helped Claimant manage his money, and managed Claimant's medications for him. (*Id.*). Dr. Casdorph remarked that Claimant had a restricted affect, residual paranoia and delusions, and moderately deficient insight, but noted that he remained fully oriented with normal psychomotor behavior. (Tr. at 278). Dr. Casdorph assessed that Claimant's social functioning was severely deficient based on the fact that he avoided social interaction; his concentration was moderately deficient based on testing; and his persistence was moderately deficient based on observation. (*Id.*).

### 2. Evaluations and opinions not considered by the ALJ

On July 24, 2017, Dr. Casdorph completed a Mental Status Statement of Ability to Do Work-Related Activities (Mental) Form. He listed Claimant's diagnoses as a brief psychotic disorder, persistent depressive disorder, and an autism disorder. (Tr. at 62). Dr. Casdorph stated that he was also considering whether Claimant suffered from schizophrenia and a personality disorder. (*Id.*). Claimant was currently prescribed Risperdal and Effexor. (*Id.*). Dr. Casdorph found that Claimant's mental impairments and symptoms were "severe/moderately severe" and stated that Claimant was "only functioning within a semi-protected structured environment at home" and "always had impaired social relatedness and [a] need for structure, but has had a gradual decline in [his] ability to tolerate any changes." (*Id.*). Dr. Casdorph noted that Claimant had chronic depression and suffered a significant episode of psychosis with auditory hallucinations and delusions that caused a significant disruption in his life approximately six or seven years earlier. (*Id.*). On a scale that included the options of none, mild, moderate, marked,

and extreme, Dr. Casdorph found that Claimant's ability to understand and remember simple instructions was moderately limited; his ability to carry out simple instructions and make judgments on simple work-related decisions was markedly limited; and his ability to understand, remember, and carry out complex instructions; interact with the public, supervisors, or co-workers; and respond appropriately to usual work situations and changes was extremely limited. (Tr. at 63). Dr. Casdorph listed that Claimant had marked difficulty thinking or concentrating and marked paranoia. (*Id.*). Finally, Dr. Casdorph remarked that Claimant could not manage his own benefits and that Claimant's mother managed all of his affairs. (Tr. at 65).

### C. Claimant's Statements

Claimant testified at his administrative hearing on July 26, 2017 that he stopped working on December 29, 2014 because he became "real nervous" due to arguments with his co-workers, who he believed talked about him and teased him. (Tr. at 37, 39). Claimant stated that he had always been a nervous person and still felt nervous around other people "some." (Tr. at 40). He lived with his mother, who helped him "some" with managing his money. (Tr. at 40, 43). However, Claimant testified that he managed his medications and doctor's appointments independently and he drove, grocery shopped, mowed the lawn, performed yard work, and worked on lawnmowers and farm tractors. (Tr. at 40-42, 44, 47). Claimant stated that he could barely read and that he could not write, but that he did not have trouble concentrating or staying on task and could count change. (Tr. at 43-45). In terms of social interaction, Claimant testified that his friends sometimes visited him and the last time that a friend visited him was a few days earlier. (Tr. at 45). In a typical day, Claimant walked around the house and went into the garage to perform maintenance on his lawn equipment, such as changing the oil, sharpening the blades, and greasing the

parts. (Tr. at 47). Claimant stated that he no longer felt paranoid or suspicious of other people since he started taking psychiatric medications. (Tr. at 48). Claimant related that Dr. Casdorph had him "lined out pretty good there now." (*Id.*).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Claimant's challenges to the Commissioner's decision can be divided into three categories. First, Claimant challenges the ALJ's decision to reject the July 24, 2017 opinion of Dr. Casdorph. Second, Claimant challenges the ALJ's decision to accord little

weight to Dr. Casdorph's June 2015 opinion. Third, Claimant challenges the Appeals Council's decision not to incorporate and consider Dr. Casdorph's July 2017 opinion and determine whether the matter should be remanded to the ALJ. Each argument is considered below, in turn.

### A. The "Five-Day Rule"

Under 20 CFR 404.935, an ALJ may decline to consider evidence that was not submitted at least five business days before the claimant's administrative hearing, unless certain exceptions apply in which case the ALJ "will accept" the late-filed evidence. The exception which Claimant contends is applicable to his case states that the ALJ will accept evidence submitted after the deadline if the ALJ has not issued a decision and the evidence was not submitted before the deadline because "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [him] from informing [the SSA] about or submitting the evidence earlier." 20 C.F.R. § 404.935(b)(3). The regulation provides non-exhaustive examples of unusual, unexpected, or unavoidable circumstances beyond the claimant's control such as serious illness, death of an immediate family member, accidental destruction of important records, or, as most relevant in this matter, situations in which the claimant "actively and diligently sought evidence from a source and the evidence was not received or was received less than five business days prior to the hearing." *Id.*

In providing guidance regarding what is often termed the "Five-Day Rule," the SSA recognized "that there will be circumstances in which claimants cannot produce evidence at least five business days before the hearing." Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987, 90990, 2016 WL 7242991 (Dec. 16, 2016). Therefore, the SSA "included

appropriate exceptions to the 5-day requirement to ensure fairness when a claimant or his or her representative actively and diligently seeks evidence but is unable to obtain it." *Id.* Regarding the listed exception concerning unexpected or unavoidable circumstances beyond the claimant's control, the SSA removed the phrase "through no fault of your own" in order "to ensure that our adjudicators interpret this exception consistent with [the SSA's] intent." *Id.* The SSA further explained that the words "actively" and "diligently" are intended to be interpreted using their ordinary English usage. *Id.* Therefore, the SSA advised that when "a claimant or representative shows that he or she made a good faith effort to timely request, obtain, and submit evidence, but he or she did not receive the evidence in time to submit it at least 5 business days before the hearing because of circumstances outside his or her control, we expect that our adjudicators would find that this standard is met." *Id.*

In this matter, the ALJ refused to accept a July 24, 2017 medical opinion from Claimant's treating psychiatrist, Dr. Casdorph, because it was submitted on July 25, 2017, one day prior to the administrative hearing. (Tr. at 17, 35). At the beginning of the hearing, the ALJ stated that she declined to include the opinion in the record because it was received within the five-day period and there was absence of good cause for not filing it by the deadline. (Tr. at 35). In her decision, the ALJ again noted that the evidence was not considered as the requirements of 20 C.F.R. § 404.935(b) were not met. (Tr. at 17).

Claimant contends that the ALJ's refusal to accept Dr. Casdorph's July 2017 opinion into evidence was an incorrect application of the law, because it was impossible for him to submit the opinion or advise the SSA of its existence more than five days before the hearing considering that the opinion did not exist at that time. (ECF No. 7 at 7). Claimant does not pose any challenge to the ALJ's decision to reject Claimant's psychiatric

treatment records that were filed with Dr. Casdorph's July 2017 opinion. *See* (Tr. at 17, 35, 67-82); (ECF Nos. 7, 9). Therefore, the undersigned focuses the analysis on the ALJ's rejection of Dr. Casdorph's July 24, 2017 opinion.

Notably, Claimant does not cite to a single authority which supports his assertion that simply because Dr. Casdorph's medical opinion was dated within the five-day period that it established an unusual, unexpected, or unavoidable circumstance beyond Claimant's control such that the ALJ should have admitted the opinion into the record under 20 C.F.R. § 404.935(b). (ECF Nos. 7, 9). Conversely, the Commissioner cites to numerous decisions from other courts which have upheld adjudicators' decisions to reject evidence that was not filed by the five-day deadline. (ECF No. 8 at 6-9). While the persuasive authorities cited by the Commissioner pre-date the current regulation, which went into effect on January 17, 2017, the relevant exception existed in prior versions of the regulations. Under the prior versions, an ALJ was likewise obligated to admit into the record evidence submitted within five days of the hearing when "[s]ome other unusual, unexpected, or unavoidable circumstance" beyond the claimant's control prevented the claimant from submitting the evidence earlier. 20 C.F.R. § 405.331(b)(3) (2006) and (2015).

Although most of the cases cited by the Commissioner relate to evidence tendered after the administrative hearing, a district court case from Maine is perhaps the most analogous to the present case. In *Freeman v. Colvin*, No. 2:14-CV-412-JHR, 2015 WL 4041733, at *2 (D. Me. July 1, 2015), the district court similarly considered an ALJ's refusal to admit evidence that was submitted one day prior to the hearing. The claimant's attorney explained that the attorney's office had difficulty obtaining the record and that the evidence was received the day before the hearing and submitted to the ALJ the same

day. *Id.* The ALJ refused to admit the evidence on the basis that the requirements of the regulation in effect at the time of the decision, 20 C.F.R. § 405.331(b), were not met. *Id.* Like the present case, the claimant argued that circumstances beyond his control prevented him from submitting the evidence earlier. *Id.* He noted that his counsel requested the record and repeatedly followed up, but that his treating providers did not produce the records until the day before the hearing. *Id.* at *2-3. Nevertheless, the court concluded that the claimant did not demonstrate that the ALJ's decision to reject the records was erroneous. *Id.* at *3. The court emphasized that an ALJ is not obligated to accept late-tendered evidence unless the claimant shows good cause for not filing it more than five days in advance of the hearing. *Id.* The court cited that the claimant did not "explain, let alone supply evidence corroborating, when he became aware of the missing records, why he only then became aware of them, how soon afterward he requested them, and what efforts he thereafter made to secure them in a timely fashion." *Id.* The court stated that such "details are material to [the] assessment of whether the standard is met." *Id.*

However, the undersigned recognizes that other courts have concluded that it can be an abuse of discretion to apply the Five-Day Rule to certain factual scenarios. In *Howe v. Colvin*, 147 F. Supp. 3d 5, 6 (D.R.I. 2015), the district court considered an ALJ's rejection of a lumbar spine RFC questionnaire prepared by the claimant's neurosurgeon, which stated that the claimant could perform less than sedentary work. The evidence at issue was submitted four days prior to the hearing due to an admitted error by the claimant's attorney, who explained that the record was stuck to another document in the attorney's file and was inadvertently not sent with the evidence in advance of the hearing. *Id.* The ALJ refused to admit the evidence and granted the claimant benefits through

October 2011, but concluded that the claimant's condition was improved after that time. *Id.* at 7. In examining the ALJ decision, the court found it critical that the evidence was directly probative of the disability decision because it was dated in October 2011 and very significantly conflicted with the ALJ's decision that the Claimant's back condition improved in October 2011 to the degree that she could perform sedentary work. *Id.* at 7-8. Ultimately, the court concluded that under those circumstances, the late submission of the evidence was a result of "an innocent clerical error" that was an "unusual or unexpected circumstance" beyond the claimant's control as contemplated in the regulation. *Id.* at 8. Thus, the court stated that "taking into account all of the relevant circumstances surrounding the party's late submission, and applying equitable principles to the situation, it [was] clear that the ALJ abused her discretion in not accepting and considering the late-submitted record." *Id.*

Based on the text of the regulation itself, the guidance provided by the SSA, the foregoing cases, and other case law interpreting the Five-Day Rule, it is clear that the ALJ's determination to reject evidence that was not submitted more than five days prior to the administrative hearing must be carefully evaluated on a case-by-case basis. A court must not replace its assessment for that of the ALJ, but in reviewing the Commissioner's decision, the court must also ensure that the Five-Day Rule was not applied more rigidly than it was intended.

Turning to the facts of the instant case, Claimant argues that the Commissioner endorses more rigorous good cause requirements than are demanded by regulatory law. (ECF No. 9 at 1). Claimant states that the Commissioner proposes that Claimant was required to make a formal objection on the record when the ALJ declined to admit Dr. Casdorph's July 2017 opinion and that he was required to explain why the evidence could

not be obtained earlier. (*Id.*). However, while the regulation does allow some flexibility in meeting the good cause standard established in 20 C.F.R. § 404.935(b)(3), it unambiguously states that it must be an "unusual, unexpected, or unavoidable circumstance" that was beyond the claimant's control that prevented him or her from informing the SSA about or submitting the evidence earlier. 20 C.F.R. § 404.935(b)(3). It can hardly be said that a medical opinion dated within the five-day period is, as Claimant suggests, *per se* proof of an unusual, unexpected, or unavoidable circumstance beyond the claimant's control. For instance, if the claimant did not request the opinion until five days before the hearing, logic would dictate that the claimant could not ordinarily show good cause for the late filing, absent some other justification. The SSA's guidance further elaborates on this point. The SSA repeatedly references active diligence on the part of the claimant or his or her representative to obtain the evidence to submit to the SSA. 20 C.F.R. § 404.935(b)(3)(iv); Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987, 90990.

Therefore, while it is clear that there are different ways in which a claimant may satisfy the exception to the Five-Day Rule established in 20 C.F.R. § 404.935(b)(3), the plain meaning of the regulation and the SSA's guidance illustrates that the claimant must make some showing that an event, which was out of the ordinary or unavoidable and was also outside of the claimant's control, prevented the claimant from informing the SSA or submitting the proposed evidence earlier. Claimant's alternative interpretation of 20 C.F.R. § 404.935(b) would require an ALJ to accept any evidence dated within five days of the hearing, regardless of what actions the claimant took to obtain the evidence earlier and submit it by the deadline. By Claimant's logic, a claimant could request and obtain evidence within five days of the hearing at his or her discretion and the ALJ would be

24

obligated to consider it. Claimant's argument is clearly contrary to the intent of the Five-Day Rule.

Here, Claimant does not make even the most minimal showing that Dr. Casdorph's July 2017 opinion could not have been submitted until the day before the hearing due to an unforeseen or unavoidable circumstance that was beyond Claimant's control. Claimant argues that it was impossible to provide the opinion sooner because it did not exist; however, he fails to show active diligence on his part to obtain the opinion from Dr. Casdorph earlier. As the Commissioner points out, Dr. Casdorph's past willingness to accommodate Claimant's requests for written opinions and reports suggests that Claimant could have gotten the completed form from Dr. Casdorph well in advance of the hearing if Claimant had only asked in time. While 20 C.F.R. § 404.935(b)(3)(iv) does not require a claimant to demonstrate that a delay in submitting evidence was through no fault of his own, the regulation does explicitly require that the delay be *outside of the claimant's control.* 20 C.F.R. § 404.935(b)(3) (emphasis added); Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. at 90990. The fact that Dr. Casdorph's opinion was not prepared until the last minute does not, in and of itself, demonstrate a circumstance outside of Claimant's control.

Therefore, the undersigned **FINDS** that the ALJ's rejection of Dr. Casdorph's July 2017 opinion on the basis that it did not meet the requirements of 20 C.F.R. § 404.935(b) was a correct application of the law and supported by substantial evidence.

### B. Weight of Treating Psychiatrist's Opinion

Claimant further argues that "it is without a doubt" that Dr. Casdorph's July 2017 opinion could have reasonably been expected to change the outcome of the ALJ's decision,

because the ALJ's stated reason for assigning little weight to Dr. Casdorph's June 2015 opinion was that he provided no rationale for his conclusions, some of which seemed to be at odds with his treatment notes. (ECF No. 7 at 7).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[1] and

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence.[2] *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the

---

[22] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin*, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ considered the opinion from Claimant's treating psychiatrist, Dr. Casdorph, dated June 6, 2015. Regarding Claimant's work-related functional limitations, Dr. Casdorph stated that Claimant remained paranoid and guarded around

others, but that with medication, Claimant was no longer acting on his psychosis. (Tr. at 277). Dr. Casdorph assessed that Claimant's social functioning was severely deficient and his concentration, persistence, and insight were moderately deficient. (Tr. at 278). Dr. Casdorph opined that it would place Claimant at a high risk for deterioration if Claimant returned to the workplace. (Tr. at 277). The ALJ weighed this opinion and concluded that Dr. Casdorph provided no rationale for his conclusions, some of which were at odds with his own treatment notes. (Tr. at 25). The ALJ discussed that not only did Claimant deny symptoms of paranoia in his administrative hearing testimony, but Dr. Casdorph repeatedly documented that Claimant had no disturbance of thought content. In addition, Dr. Casdorph had reduced Claimant's antipsychotic medications on two separate occasions. (*Id.*). Therefore, the ALJ afforded little weight to this piece of evidence.

A review of the record substantially supports the ALJ's determination that Dr. Casdorph's June 2015 opinion was entitled to little weight due to its lack of support and consistency with the record. Claimant's clinical treatment with Dr. Casdorph from April 2015 through July 2017 is well documented in the record. Claimant's mental status examinations did not reveal any severe issues throughout that period. (Tr. at 288-92, 304-28, 355-70). Dr. Casdorph repeatedly noted that Claimant was stable on medications; Claimant's thought processes remained intact throughout his treatment; and his psychosocial and environmental problems were noted to be mild. (Tr. at 288-90, 309-10, 311, 315-17, 319, 321, 324-25, 355-56, 360, 365-66). Even Claimant's treatment records that were the closest in time to Dr. Casdorph's June 6, 2015 opinion did not reconcile with Dr. Casdorph's statements that Claimant continued to be paranoid and had severely deficient social functioning and moderately deficient concentration, persistence, and insight. In April 2015, Dr. Casdorph recorded that Claimant had been relatively symptom-

free since beginning medications and continued to be reasonably with only minor adjustments to his medications. (Tr. at 288). Claimant's thought processes were goal-directed, logical, and relevant; his thought content was appropriate; and he was noted to have only mild problems related to his social environment. (Tr. at 289, 290). In July 2015, Claimant was still responding to his medications; his thought processes and judgment were intact; and his psychosocial and environmental issues were mild. (Tr. at 310, 311).

Although Claimant primarily stayed at home, he continued to engage in activities of interest to him; such as, mowing the lawn, working on lawnmowers and tractors, and performing yard maintenance. (Tr. at 319, 324, 365). In June 2016, Dr. Casdorph noted that Claimant had been stable for over two years, and his depression and delusions resolved with treatment. (Tr. at 358). Indeed, according to the clinical notes, Claimant continued to do well even as Dr. Casdorph lowered his doses of medication in July and September 2016. (Tr. at 360, 365). During Claimant's September 2016 appointment with Dr. Casdorph, which is the final psychiatric treatment record in the file considered by the ALJ, Claimant stated that he was "doing well." (Tr. at 365). His mood was stable; he had no disturbances in thought content; and he continued to engage in activities of interest. (*Id.*). Claimant's mental status examination was normal other than a constricted, but appropriate, affect. (Tr. at 366).

Claimant asserts that Dr. Casdorph's July 2017 opinion "augmented" his June 2015 opinion. (ECF No. 7 at 7). Claimant points to the fact that Dr. Casdorph explained in the July 2017 opinion that Claimant was only functioning within a semi-protected structured environment at home and, although he always had impaired social relatedness, he had a gradual decline in his ability to tolerate any changes. (ECF No. 7 at 8) (quoting Tr. at 62). Further, Dr. Casdorph explained that Claimant had chronic depression, suffered a

psychotic episode six to seven years earlier that significantly disrupted his life, avoided relationships, and had extreme difficulties with perceptual or thinking disturbances with pathologically inappropriate suspiciousness or hostility. (*Id.*) (citing Tr. at 64). According to Dr. Casdorph, Claimant's "autistic behaviors" had gradually worsened and causing him to remain marked/extremely impaired and functioning only within a sheltered environment. *Id.* (citing Tr. at 65).

However, as noted by the Commissioner and as shown above, the ALJ assigned little weight to Dr. Casdorph's June 2015 opinion not only due to the lack of explanation, but also because the June 2015 opinion was inconsistent with Dr. Casdorph's treatment notes. The ALJ articulated the specific discrepancies. (Tr. at 25). Thus, the addition of Dr. Casdorph's July 2017 opinion into the record would not have, in any way, disturbed the ALJ's conclusion that the June 2015 opinion was inconsistent with the treatment records.

Although Claimant argues that Dr. Casdorph's July 2017 opinion "certainly would have helped the ALJ understand" the June 2015 opinion, (ECF No. 7 at 9), an examination of the July 2017 opinion reveals very little information that was not already available at the time the ALJ considered Dr. Casdorph's June 2015 opinion. The treatment records that the ALJ reviewed contained Dr. Casdorph's observation that Claimant's living arrangement was "sheltered," and that Claimant remained stable in that environment. (Tr. at 309, 324, 368). The record concerning Claimant's in-patient psychiatric admission in 2010 likewise was available to the ALJ, as was Dr. Casdorph's impression that Claimant had recovered well enough from that episode, as of December 27, 2010, to return to work. (Tr. at 275-76, 280). With respect to Claimant's social functioning, Dr. Casdorph's clinical notes stated that Claimant had life-long social relatedness issues, rarely left home without his mother, and avoided crowds. (Tr. at 307, 314, 324). Therefore, all such information

31

was already considered by the ALJ. While July 2017 was the first time Dr. Casdorph used the term "autistic" to describe the constellation of Claimant's behaviors, the behaviors themselves and their functional impact on his daily routine had been well documented in the record. Equally well documented were Claimant's improvement while on medication and his relative stability over an extended period of time.

As to Claimant's contention that the July 2017 opinion reasonably could have been expected to change the outcome of the disability determination, Claimant ignores other evidence considered by the ALJ that conflicted with Dr. Casdorph's July statement. Claimant related during his April 2015 consultative examination that his activities of daily living included going to the store, eating out at restaurants, and attending church services weekly; running errands and visiting with family and friends daily; and speaking with his niece on the telephone every other day. (Tr. at 297). During his administrative hearing in July 2017, Claimant stated that he still felt nervous around people "some," but that he no longer felt paranoid or suspicious of other people ever since he began taking medication. (Tr. at 40, 48). He continued to drive, grocery shop, mow the lawn, and perform yard work and he enjoyed working on lawnmowers and farm tractors. (Tr. at 42, 44, 47). Claimant's friends sometimes visited him at his home, with the most recent social visit occurring just a few days before Claimant's administrative hearing. (Tr. at 45).

In sum, the record was sufficiently developed regarding Claimant's mental abilities and limitations. The record included Claimant's psychiatric treatment notes, mental consultative examination report, statements from Claimant's treating psychiatrist, non-examining evaluations, and Claimant's own testimony and statements. The ALJ articulated her consideration of this evidence in the decision and provided reasoned support for the conclusions that she reached. (Tr. at 20-25). Ultimately, while the ALJ

disagreed that Claimant's limitations rendered him completely disabled, the ALJ assessed that Claimant had moderate limitations in maintaining concentration, persistence, or pace and in adapting or managing himself. (Tr. at 22). The ALJ accordingly restricted Claimant's RFC to simple, routine, repetitive tasks of one to two steps, occasional interaction with supervisors and coworkers, no interaction with the public, no team work or over-the-shoulder supervision, simple work-related decisions, and no fast-paced production requirements. (Tr. at 23). Claimant simply fails to show that Dr. Casdorph's untimely-submitted July 2017 opinion filled any evidentiary gaps or provided any significant new or conflicting information in comparison to the evidence that the ALJ considered. The undersigned disagrees with Claimant's assertion that "it is without a doubt" that Dr. Casdorph's July 2017 opinion could have been reasonably expected to change the outcome of the ALJ's decision.

The Court's role in reviewing the weight that an ALJ assigned to medical opinions is limited to determining whether the ALJ's decision is supported by substantial evidence and based upon a correct application of the law. As noted, the Court's role is not to substitute its analysis for that of the ALJ, nor is it to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456. In this case, the ALJ complied with the law in reviewing and considering Dr. Casdorph's June 2015 opinion and determined that his conclusions regarding Claimant's restrictions and inability to return to work were not supported by his medical findings. Rather, the ALJ found that Dr. Casdorph's opinions were, in fact, inconsistent with Claimant's treatment records from the relevant period. For all of the above reasons, the undersigned **FINDS** that the ALJ properly considered and weighed the evidence from Claimant's treating psychiatrist, Dr. Casdorph.

### *C. Appeals Council*

Finally, Claimant challenges the Appeals Council's decision to not review his case. (ECF No. 7 at 7, 8, 9). Claimant indicates that the Appeals Council should have compared Dr. Casdorph's July 2017 opinion with the record as a whole to determine if remand was appropriate. (*Id.* at 8, 9).

The Appeals Council will review a case if:

(1) There appears to be an abuse of discretion by the administrative law judge;

(2) There is an error of law;

(3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence;

(4) There is a broad policy or procedural issue that may affect the general public interest; or

(5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. § 404.970(a).

As indicated in the above-quoted text, a claimant must satisfy additional requirements in order for the Appeals Council to review a case on the basis of additional evidence. Similar to the Five-Day Rule that the ALJ applied, the Appeals Council must only consider a claimant's case on the basis of new evidence if the claimant shows good cause for not informing the SSA about or submitting the evidence earlier for one of three specified reasons. 20 C.F.R. § 404.970(b). Again, as relevant to this matter, a claimant can establish good cause by demonstrating that "[s]ome other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented [him] from

34

informing [the SSA] about or submitting the evidence earlier." 20 C.F.R. § 404.970(b). Examples of such circumstance include, but are not limited to, serious illness, death of an immediate family member, accidental destruction of important records, a circumstance in which the claimant actively and diligently sought evidence from a source and the evidence was not received or received less than five business days prior to the hearing, or the claimant received a hearing level decision on the record and the Appeals Council reviewed the decision. *Id.* at § 404.970(b)(3).

In this case, the Appeals Council declined to review the ALJ's decision because it did not find that any of the reasons for review under 20 C.F.R. § 404.970(a) existed. (Tr. at 1-2). The Appeals Council noted that it did not find good cause for Claimant not informing the SSA about or submitting Dr. Casdorph's July 2017 opinion earlier. (Tr. at 2). Thus, the Appeals Council did not consider such evidence and did not incorporate it into the record. (*Id.*).

As discussed, the only reason that Claimant provided for the late filing of Dr. Casdorph's July 2017 opinion was that it was not prepared until two days before his administrative hearing. The Appeals Council agreed with the ALJ that such circumstance did not establish good cause. For the same reasons discussed in the preceding section, the undersigned finds the Appeals Council's determination that Claimant did not establish good cause for review of his case was not contrary to the law or unsupported by substantial evidence. Claimant did not establish any unusual, unexpected, or unavoidable circumstance beyond his control that prevented him from informing the SSA about or submitting the evidence earlier. 20 C.F.R. § 404.970(b). He offered nothing to show any active diligence on his part in securing the information. *Id.* at § 404.970(b)(3). Therefore, because Claimant did not establish good cause, the Appeals Council was not required to

review the new evidence and determine whether it established a basis to remand the decision to the ALJ. *Scherer v. Berryhill*, No. 2:17-CV-53, 2018 WL 1960531, at *3 (N.D.W. Va. Apr. 26, 2018) ("Without the plaintiff falling into one of these good cause exceptions, the Appeals Council had no such duty to review the new evidence.").

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 8); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140

(1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** December 10, 2018

Cheryl A. Eifert
United States Magistrate Judge